JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 4715

```
-------------------------------------------------------------x
CAROL KULIG                                          )      No. Civ._____
on behalf of herself and all others similarly situated)
                    Plaintiff                        )
                                                     )
                                                     )      COMPLAINT AND
           -v.-                                      )      JURY TRIAL DEMAND
MIDLAND FUNDING, LLC,                                )
MIDLAND CREDIT MANAGEMENT, INC.                      )
ENCORE CAPITAL GROUP, INC.                           )
        formerly MCM CAPITAL GROUP, INC.             )
AMANDA PEREZ                                         )
                    Defendants                       )
-------------------------------------------------------------x
```

RECEIVED
JUL - 8 2013
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Carol Kulig brings suit against Defendant debt collectors for systematically filing and litigating time-barred lawsuits against Plaintiff and hundreds of other individuals in New York, in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, New York General Business Law § 349 *et seq.*, and New York Judiciary Law § 487 *et seq*.

### A.   JURISDICTION AND VENUE

1.    The Court has federal question jurisdiction over the lawsuit under 28 U.S.C. § 1331 because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA").  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.    Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in New York County, New York.

### B.   PARTIES

*Plaintiff*

3.   Plaintiff Carol Kulig is an individual who resides in New York County, New York.

*Midland Funding LLC ("MF")*

4.   Defendant Midland Funding LLC ("MF") is a Delaware corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123. It does or transacts business in the state of New York.

5.   MF is in the business of taking title or claiming to take title to charged-off debts allegedly owed by consumers and originally owed to others.

6.   MF has no employees.

7.   MF then seeks to enforce the debts against the consumers through lawsuits.

8.   MF filed hundreds of thousands of collection lawsuits in New York courts in 2012; 313,995 of them in just the 68 courts available on the New York "e-courts" system, https://iapps.courts.state.ny.us/webcivil/ecourtsMain.

9.   The mails and telephone system are used in connection with the prosecution of these MF lawsuits.

10.  MF is a "debt collector" as defined in the FDCPA.

*Midland Credit Management ("MCM")*

11.  Defendant Midland Credit Management ("MCM") is a Kansas corporation with its principal place of business also located at 8875 Aero Drive, Suite 200, San Diego, CA 92123. MCM does business in the state of New York.

12.  MCM holds a collection agency license from the New York City Department of Consumer

Affairs.

13.    MCM is the servicer for MF.  While collection lawsuits are filed in the name of MF, the owner of the putative debt, the affirmative collection attempts to collect that debt are taken by MCM. These affirmative steps include the sending of collection letters, the making of collection phone calls, and the arrangement with counsel for collection lawsuits in the name of MF.

14.    MCM uses the mails and telephone system to conduct its business.

15.    MCM is a "debt collector" as defined in the FDCPA.

*Encore Capital Group ("Encore")*

16.    MCM and Midland Funding LLC are under common ownership. Both are wholly owned subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

17.    Encore has stated in its filings with the Securities & Exchange Commission, "We are a leader in consumer debt management and recovery solutions...  We purchase portfolios of defaulted consumer receivables at deep discounts to face value and use a variety of operational channels to maximize our collections from these portfolios." Exhibit A, Form 10-K filed by Encore with the SEC for year ending Dec. 31, 2012, original page 1.

18.    Encore (a) secures funds from investors and lenders for the purpose of purchasing the debts to which MF takes title, (b) devises the collection strategies used by the other Defendants, and (c) participated in the debt collection activities complained of.

19.    Encore is a "purchaser and manager of charged-off consumer receivables portfolios" – i.e., bad consumer debts. Exhibit B, form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

20.    Encore "acquires these portfolios at deep discounts from their face values." A June 9, 2011

filing with the SEC (Form 8K, Exhibit 99.1) reflecting a presentation at an "Investor Day" by

Brandon Black, President and Chief Executive Officer, Paul Grinberg, EVP and Chief Financial

Officer, Amy Anuk vice president for Business Development and Manu Rikhye, Managing Director

of India Operations, stated that Encore had invested $1.9 billion to acquire receivables with a

face value of $58 billion since its inception, or about 3.3 cents on the dollar, and had acquired 34

million consumer accounts since its inception. *See* Exhibit C.

21.    The same document states that in 2011 collections from lawsuits resulted in revenue of $266.8

million in 2010 and $88.5 million during the first quarter of 2011.

22.    During 2010, total collections by Encore amounted to $604.6 million (Exhibit D, Form 10-K

for year ending Dec, 31, 2010, original page 25).Encore devises the "collection strategies" used by

its subsidiaries. This is demonstrated by the documents Encore files with the Securities and

Exchange Commission.[1]

23.    Tellingly, Encore's "collection strategy" is incorporated, almost verbatim, in

the gratuitous, superfluous language that MF uses in its boilerplate verified

---

1. Encore states under the header "Collection Approach" in the form 10-K it filed with the SEC that:

> We expand and build upon the insight developed during our purchase process when developing our account collection strategies for portfolios we have acquired. Our proprietary consumer-level collectability analysis is the primary determinant of whether an account is actively serviced post-purchase. Generally, we pursue collection activities on only a fraction of the accounts we purchase, through one or more of our collection channels.   The channel identification process is analogous to a decision tree where we first differentiate those consumers who we believe are unable to pay from those who we believe are able to pay. ...

> It is our practice to assess each consumer's willingness to pay through analytics, phone calls and/or letters...However, the majority of consumers we contact ignore our calls and our letters and we must then make the decision about whether to pursue collections through legal action....   Throughout our ownership period, we periodically refine this analysis to help determine the most effective collection strategy to pursue for each account.

> Exhibit A, Encore form K-10 the year ending December 31, 2012, original p. 4.

Last saved 7/8/2013 3:55 PM

complaints against class members such as Ms. Kulig.[2]

24. Encore states in the form 10-K it filed with the SEC that, "Leveraging an industry-leading distressed consumer database, our in-house team of statisticians, business analysts, and software programmers have developed, and continually enhance, proprietary behavior and valuation models, custom software applications, and other business tools that guide our portfolio purchases. Moreover, our collection channels are informed by powerful statistical models specific to each collection activity, and each year we deploy significant capital to purchase credit bureau and customized consumer data that describe demographic, account level, and macroeconomic factors related to credit, savings, and payment behavior." Exhibit A, Encore form K-10 for the year ending December 31, 2012, original p. 4.

25. Through "its subsidiaries, Encore Capital Group purchases portfolios of consumer receivables from major banks, credit unions, and utility providers, and partners with individuals as they repay their obligations and work toward financial recovery." Exhibit F, March 6, 2013 filing with the SEC (Form 8K, Exhibit 99.1).

26. Encore has a direct role in developing and controlling the collection strategies it executes under the names of MF and MCM.[3]

---

2 ¶ 3 – 5 of the verified complaint, attached as Exhibit E, states in relevant part:

> In doing so, Midland attempts to assess each consumer's willingness to pay, through phone calls, letters or other means. ... However, the majority of Midland's consumers ignore calls or letters, and some simply refuse to repay their obligations despite an apparent ability to do so. When this happens, Midland must decide then whether to pursue collection through legal channels, including litigation like the present action against Defendant.

3 Encore EVP and CFO, Paul Grinberg stated in a November 1, 2012 earnings conference call:

> Collections reached an all-time high and continued investments in our operating platform give us confidence in our ability to expand upon the operating leverage created over the past few years....

> Over time, we expect our cost-to-collect to continually improve, but also expect it to fluctuate from quarter to quarter based on seasonality, the cost of investments in new operating initiatives, and the ongoing management of the changing regulatory and legislative environment.  Over the next 12 months, we will be

27.   Encore is responsible for determining what debts to purchase and at what price.[4]

---

making additional investments in more comprehensive audits of third-parties, internal compliance staff and various consumer support services.

Due primarily to the large purchasing volume and the strong performance of portfolios purchased over the last couple of years, our Estimated Remaining Collections, or ERC, at September 30th increased by 425 million dollars, to approximately 1.9 billion dollars. As we've discussed previously, we believe that our ERC, which reflects the estimated remaining value of our existing portfolios, is conservatively stated because of our cautious approach to setting initial curves and our practice of only increasing future expectations after a sustained period of over- performance.

As Brandon mentioned, third quarter collections were very strong, at 246 million dollars, up 30 percent from 2011. Our call centers contributed 48 percent of total collections, or 117 million dollars, compared to 83 million dollars. Direct cost per dollar collected in our call centers fell to 5.9 percent in the third quarter, from 7.2 percent.

This improvement is largely the result of two factors. The first is enhancements to our analytical models, which allows us to focus our efforts on consumers who we believe have the ability and are most likely to pay. The second is the increasing maturity of our operations center in India. In the third quarter, our call center in India accounted to 53 percent of total call center collections, compared to 50 percent in 2011....

I'd like to reiterate that our long-stated preference is to work with our consumers to negotiate a mutually acceptable payment plan, tailored to their personal financial situation. These plans almost always involve substantial discounts from what is owed. We not only believe that this is the right thing to do for our consumers, but the right thing to do for our business. When we do litigate, we pledge to be fair and reasonable throughout the process. Unfortunately, the vast majority of our consumers do not engage with us to resolve their financial obligations. Accordingly, and as a last resort, we are often left only with the option of using legal means to recover debts that are owed.

Exhibit G, November 1, 2012 filing with the SEC (Form 8K, Exhibit 99.1)

On Oct. 28, 2004, Encore CEO Gregory stated in an October 28, 2004 earnings conference call:

. . . Our board also elected Brandon Black, President and Chief Operating Officer of the Company. Brandon has been Executive Vice President and Chief Operating Officer for the past 5 years and has done a superb job. Brandon is the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business. His intelligence, analytical ability and drive for success have been instrumental in Encore's success and in his new role will be key factors as we continue to build the business. . . .

On the purchasing front, we invested $21 million in new portfolios during the quarter, up 10 percent from the prior year's quarters purchases of $19 million. Our average purchase price for the quarter was 2.91 percent which was down slightly from last year's 3.02 percent. This was not as much as we had hoped to invest but appropriate given the high prices for much of the available supply.

Year-to-date, our purchases have been $57 million or about $7 million less than last year's first 3 quarters. For the year-to-date, approximately 48 percent of our purchases have been non-credit card, compared with just 6 percent last year for the same period. We will have more to say about purchasing in a minute but the purchasing discipline and analytical approach we've always taken are more important now than ever before. . . .

Exhibit H.

4.  In an earnings conference call conducted by executives of Encore on Aug. 3, 2004, Encore CEO Gregory stated:

Encore enjoyed another good quarter. Our collections, revenue and net income all increased. In

6

28.   In filing many of the time-barred debt collection lawsuits at issue in this case, MF uses attorneys who appear to be its own in-house counsel, as opposed to hiring an outside firm.

29.   However, as previously noted, MF in fact has no employees.

30.   Rather, the persons listed as in-house counsel for MF apparently work for MCM and Encore.

31.   When one calls the number for the attorney listed in the collection lawsuit filed by in-house counsel for MF against Ms. Kulig, the call is answered "You have reached Encore Capital Group."

32.   Similarly, when one enters the root email name, mcmcg.com, for the "in-house counsel" for MF listed on the collection lawsuit, the link immediately

---

addition, we closed a terrific new loan with J.P. Morgan Chase that dramatically lowers our cost of borrowing, increases our flexibility, and should result in better financial returns for Encore.

Finally, just after the end of the quarter, we closed the biggest purchase we've ever made on terms we considered quite attractive. We are very excited about our industry and its future, but most importantly, Encore's ability to excel in the future.

On Aug. 3, 2004, Encore CEO Gregory stated in another such call:

We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.

The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectability score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.

We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.

forwards you to the Encore website, http://www.encorecapital.com/

33.   Because of its intimate involvement in collection activities, Encore is a debt collector as defined in the FDCPA.

34.   As is true with many of the collection lawsuits filed by MF, the MF suit in the case at bar was filed in the name of one of four attorneys listed as "in-house counsel" for MF.

### The "Midland Defendants"

35.   For the reasons stated above, MF, MCM, and Encore operate as a joint venture to collect putative debts. For this reason, this complaint will use the term "Midland Defendants" to refer to them jointly and severally.

### Amanda Perez

36.   Defendant Amanda Perez ("Perez") is the attorney who signed the verified MF complaint against Ms. Kulig.

37.   Perez signed the verified complaint as "in-house counsel" for MF.

38.   The form MF uses for its verified complaints list five "in-house counsel" for MF with a box next to each name.

39.   Perez is one of the five attorneys listed as in-house counsel.

40.   Perez checked the box next to her name and (purportedly) signed the verified complaint against Ms. Kulig.

41.   E-courts listed Perez as the attorney of record in 2,872 of the cases filed by MF in 2013.

42.   Perez is a debt collector because she (purportedly) signs thousands of collection lawsuit

Last saved 7/8/2013 3:55 PM

pleadings, and (purportedly) litigates thousands of collection lawsuits for MF.

43. Defendant Amanda Perez is an individual who works in New York State, and who committed the actions that give rise to this suit in New York State. She may be served at her place of employment, Midland Credit Management, Inc., 75 Maiden Lane, Suite 207, New York, NY 10038, or wherever she may be found.

## C.   STATEMENT OF FACTS

44. On August 1, 2012, MF filed a verified complaint against now-Plaintiff Carol Kulig in Index Number CV-021071-12/NY, Midland Funding LLC v. Kulig, Carol, New York Civil Court. The complaint is attached as Exhibit E and incorporated by reference.

45. Perez personally signed the verified complaint on July 9, 2012, or at least that representation was made as her signature was affixed to the complaint.

46. On October 5, 2013 Ms. Kulig filed a *pro se* answer to the collections lawsuit.

47. The complaint sought to collect an alleged credit card debt where Chase Bank USA, NA ("Chase") was the original creditor.

48. The verified complaint sought interest from June 17, 2009.

49. June 17, 2009 is the date that the verified complaint (at ¶ 7) contends MF "purchased a pool of charged-off accounts pursuant [sic] Purchase and Sale Agreement and Bill of Sale."

50. The complaint does not indicate if the accounts were purchased from Chase or from a prior debt buyer.

51. A debt is "charged-off" six months after the date of the default with the putative original

creditor. [5]

52.    The debt collection lawsuit is time barred because it was filed more than three years after the accrual of the cause of action by the putative original creditor.

53.    Under New York's "borrowing statute," CPLR 202, when a nonresident sues in New York on a cause of action accruing outside New York, the action "cannot be commenced" unless the action is within the statute of limitations of both New York and the jurisdiction where the cause of action accrued. *Portfolio Recovery Assoc., LLC v. King*, 14 N.Y.3d 410, 416-17, 927 N.E.2d 1059, 1061-62 (2010), *citing to Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528, 715 N.E.2d 482, 484 (1999).

54.    As a purported creditor contends it suffered an economic harm for a breach of an alleged credit card agreement, the creditor's cause of action "accrues where the plaintiff resides and sustains the economic impact of the loss." *Id.* (internal quotes omitted).

55.    Chase has its main office, as set forth in its articles of association,[6] in Delaware. Chase has its principal place of business – indeed its sole place of business -- in Delaware. This has been true from the date of the alleged default of the account to present.  Indeed this has been true since at least February 2001.

56.    Attached as Exhibit I is as true and correct copy of the Articles of Association of Chase. The document lists Chase's "main office" as located in Delaware.

57.    Attached as Exhibit J is a true and correct copy of the first page of the K-10 Form that

---

[5] A charge-off occurs when a creditor moves a debt from profit to loss on its balance sheet, typically 180 days after the account becomes delinquent. See, e.g., Fed. Fin. Institutions Examination Council, Uniform Retail Credit Classification and Account Management Policy, 64 Fed. Reg. 6,655 at 6,656 (Noting that commentators representing the credit card industry stated they charged off open-ended credit accounts 180 days after delinquency.)
[6] Corporations have articles of incorporation and a state of incorporation. National banks do not. Instead, national banks designate a state for its "main office" in their "articles of association."

Last saved 7/8/2013 3:55 PM

Chase filed with the Securities and Exchange Commission. Chase lists its principal executive offices in Delaware.

58.   Attached as Exhibit K is a true and correct copy of the Affidavit of a Corporate Vice President and Custodian of Records of Chase, Anthony Demczak. The affidavit avers that the Delaware is the sole state that Chase maintains any office, including its principal place of business. Specifically, the affidavit states, in relevant part:

> Chase Bank USA, N.A. ("Chase") is a national bank chartered pursuant to the laws of the United States of America with a principal place of business located in Newark, Delaware. Chase *only* maintains offices in the state of Delaware and does not have any branches in any other state.
>
> (emphasis added).

59.   The Demzak affidavit was submitted as evidence in a 2010 NY court decision reciting facts that supported the court's conclusion that the principal place of business of Chase is in Delware. *Chase Bank, USA, N.A. v. Fisher*, 28 Misc. 3d 440, 441, 442, 905 N.Y.S.2d 755, 756, 757 (Dist. Ct. 2010) (""[P]laintiff [Chase Bank, USA, N.A.] has submitted sworn written and documentary proof of the amounts claimed in the action. That proof establishes, inter alia, that plaintiff is a national bank with a principal place of business in the state of Delaware... The verified complaint alleges, in non-conclusory terms, that the plaintiff bank has "a principal place of business at 200 White Clay Center Drive, Newark, Delaware."")

60.   When Chase files suit in its own name to collect debts, it files a verified complaint listing Chase's address as 200 White Clay Center Drive, Newark DE. An example of such a verified complaint is attached as Exhibit L.

61.   Therefore, Chase's cause of action for breach of a credit contract accrued in Delaware.

62.   The statute of limitations for breach of a credit contract is three years under Delaware state

law, Del. Code Ann., Tit. 10, § 8106; *King* at 1060.

63.    MF was required to file and serve the collection suit within the same time period as the putative original creditor because MF, as the putative assignee, cannot stand in better shoes than the putative assignor. *King* at 1016.

64.    By filing and serving the collection lawsuit, Defendants represented to Ms. Kulig, to class members, and to the Court that the debt they were collecting upon was not time barred when in fact it was. Defendants misrepresented that the debts they seek to collect are not time barred for the purposed of deceiving Ms. Kulig and other consumers (least sophisticated or otherwise) into believing they had no basis on limitations grounds to challenge the collection lawsuits; that any attempt to challenge the collection lawsuits on limitations grounds would be futile; and therefore that the consumers should not challenge these suits in court but instead had no choice to pay what was demanded under the (illegal) threat of judgment and court costs on time barred debts. Likewise, the purpose of these misrepresentations was to deceive the civil court that now-Defendants were entitled to judgment and costs of court when they were not.

65.    In the verified complaint, MF stated it "demands judgment" against Ms. Kulig. However, as the debt was time-barred, the demand was a threat to take an act prohibited by law.

66.    Ms. Kulig was fortunate enough to obtain an attorney to represent her in the collection lawsuit after she filed a pro se answer. On January 15, 2013 The Law Office of Ahmad Keshavarz filed a notice of appearance, and was ultimately able to secure a discontinuance with prejudice of the collection lawsuit.

67.    The vast majority of consumers are not as fortunate as Ms. Kulig. "There were 241,195 debt collection lawsuits filed in New York in 2009, where 99% of the debtors were not

represented by counsel, and where 66% of these cases resulted in defaults." *Diaz v. Portfolio Recovery Associates, LLC*, 2012 WL 661456 at * 8 (E.D.N.Y. Feb. 28, 2012) *report and recommendation adopted*, 2012 WL 1882976 (E.D.N.Y. May 24, 2012).

68. While the FDCPA is a strict liability statute, Defendants actually knew that Chase has its main office, as set forth in its articles of association, in Delaware, and has its principal place of business in Delaware.

69. It is the pattern and practice of Defendants to file time barred collection lawsuits where the putative original creditor is **a bank which resides in, and sustained economic impact from the alleged failure to pay in, Delaware,** and the cause of action accrued more than three years from the date they filed and served the collection lawsuit. Defendants have done so, and continue to do so, in hundreds if not thousands of cases.

70. Plaintiff suffered damages in the form of the time lost and the expenses incurred in having to defend against a lawsuit that Defendants had no legal right to file or serve in the first place.

### D. CLASS ALLEGATIONS

71. Plaintiff seeks to certify a class that consists of all persons who, according to said Defendants' records:

    a. have addresses within New York State;

    b. had a lawsuit filed or served against them by Midland Funding within one year before the filing of this action (for FDCPA claims) or within three years before the filing of this action (for GBL 349 and Judiciary Law 487 claims);

    c. the suit was predicated on alleged credit card debt to a bank which resides in, and sustained economic impact from the alleged failure to pay in, Delaware;

     **d.**   the putative debt was incurred primarily for personal, family or household purposes; and the suit was filed more than 2 ½ years after the account sued upon had been charged off by said bank.

72.    A subclass of this class consists of individuals within the class whose collection lawsuit pleadings were signed by the Defendant Perez.

73.    Under Federal Rule of Civil Procedure 23, a class action is appropriate and preferable in this case because:

     **a.**   The classes are so numerous that joinder of all members is impractical because Defendants have filed and caused to be filed hundreds, if not thousands, of time barred collection suits.

     **b.**   There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. These common questions include which statute of limitations governs a debt buyer's collection suits in New York State courts that are predicated on its purchase of accounts from a Delaware bank; whether the collection lawsuits at issue in this case were time-barred; whether the collection lawsuits at issue in this case violate the FDCPA, GBL 349, and/or Judiciary Law 487; and whether amounts paid as a result of such time-barred suits are recoverable as actual damages. . All of these issues are based on the same facts and legal theories for the class. The only individual issue is the identification of the consumers who received the written communications or who had lawsuits filed against them, (i.e., the class members), which is a matter capable of ministerial determination from the Defendants' records. The existence of such records will also make a class action for damages manageable.

c.  The claims of Named Plaintiff are typical of the class members' claims in that she was the victim of a suit by Defendants on alleged Chase credit card debt that was time-barred.  The Named Plaintiff will fairly and adequately represent the class members' interests.  All claims are based on the same facts and legal theories and Named Plaintiff's interests are consistent with the interests of the class.

d.  Named Plaintiff has retained counsel experienced in bringing class actions and collection abuse claims.

74.  Written communications, such as those sent by Defendants, are to be evaluated by the objective standard of the hypothetical "least sophisticated consumer."

75.  A class action is superior for the fair and efficient adjudication of the class members' claims.

76.  Congress specifically envisions class actions as a principal means of enforcing the FDCPA. See 15 U.S.C. § 1692k.

77.  The class members are generally unsophisticated individuals unaware of the protections afforded them by the FDCPA, GBL 349, and Judiciary Law 487 and whose rights will not be vindicated in the absence of a class action.

78.  Prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications resulting in the establishment of inconsistent or varying standards for the parties and would not be in the interest of judicial economy.

E.  **COUNT # 1: Violations of the Fair Debt Collection Practices Act.**

79.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

80.  The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt

15

collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

81.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

82.    The obligation MF allege plaintiff owes is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes.

83.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

84.    The actions of Defendants enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

85.   Defendants violated the following sections of the FDCPA: 15 USC 1692d, 1692e, and 1692f. By way of example and not limitation Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: engaging in conduct the natural consequence of which is to harass, oppress or abuse any person; using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the compensation which may be lawfully received; threatening to take and actually taking an action prohibited by law; using any false representation or deceptive means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

### F.   Count # 2: New York General Business Law Section 349 *et seq.*

86.   Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

87.   New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state . . ."

88.   An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h).

89.   As enumerated above, Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. This includes threatening, filing, prosecuting, maintaining, and seeking judgment in hundreds of lawsuits seeking to collect time

barred debts; and seeking post-judgment collections on the same.

90.    Defendants made implicit misrepresentations that the debts they seek to collect are not time-barred for the purpose of deceiving Plaintiff and other consumers (least sophisticated or otherwise) into believing they had no basis on limitations grounds to challenge the collection lawsuits; that any attempt to challenge the collection lawsuits on limitations grounds would be futile; and therefore that the consumers should not challenge these suits in court but instead had no choice but to pay what was demanded under the (illegal) threat of judgment and court costs on time barred debts. Likewise, the purpose of these misrepresentations was to deceive the court that now-Defendants were entitled to judgment and costs of court, when they were not.

91.    Defendants' conduct has a broad impact on consumers at large.

92.    Defendants' conduct impacts the thousands of consumers in the state of New York who have had time barred collection lawsuits on alleged credit card debt originated by Delaware banks threatened, filed, maintained, or prosecuted against them.

93.    Defendants committed the above described acts willfully and/or knowingly.

94.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

95.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq.*, Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, as to recover actual and treble damages, costs and attorney's fees.

## G.    COUNT # 3, New York Judiciary Law § 487

96.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with

Last saved 7/8/2013 3:55 PM

intent to deceive the court or any party;" or "wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

97.   Defendants violated § 487 in their systematic misrepresentations to the courts and to consumers. Defendants implicitly represented that the debts they were collecting upon were not time barred when in fact they were time barred.

98.   Defendants made these misrepresentations for the purposed of deceiving Plaintiff and other consumers (least sophisticated or otherwise) into believing they had no basis on limitations grounds to challenge the collection lawsuits; that any attempt to challenge the collection lawsuits on limitations grounds would be futile; and therefore that the consumers should not challenge these suits in court but instead had no choice but to pay what was demanded under the (illegal) threat of judgment and court costs on time barred debts. Likewise, the purpose of these misrepresentations was to deceive the court that now-Defendants were entitled to judgment and costs of court, when they were not.

99.   The violations of § 487 by Defendants inflicted damages, for the reasons and in the manner previously indicated.

100.  Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487 by Defendants, and Plaintiff so seeks.

## H.   **JURY DEMAND.**

101.  Plaintiff demands a trial by jury.

## I.   **PRAYER**

102.  WHEREFORE, the Named Plaintiffs and members of the class request the following relief joint and severally against Defendants:

a.   An order certifying this case as a class action under FRCP 23;

19

b. A declaration that Defendants have committed the violations of law alleged in this action;

c. An order enjoining and directing Defendants to cease violating GBL § 349 *et seq.*;

d. Statutory damages under 15 U.S.C. § 1692k and GBL § 349(h);

e. Actual damages;

f. Civil penalties under GBL § 349 and Judiciary Law § 487;

g. Treble damages under GBL § 349 and Judiciary Law § 487;

h. An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k, GBL § 349, and Judiciary Law § 487;

i. Prejudgment and post judgment interest as allowed by law; and

j. All other relief, in law and in equity, both special and general, to which the Named Plaintiffs and the class may be justly entitled.

Dated: Brooklyn, New York
July 8, 2013

Respectfully submitted,

Ahmad Keshavarz
One of Plaintiff's Attorneys
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

NATIONAL CONSUMER LAW CENTER, INC.

Charles M. Delbaum w/p

Charles M. Delbaum, Esq. (to be admitted pro hac vice)

Last saved 7/8/2013 3:55 PM

7 Winthrop Square, 4th floor
Boston, MA 02110
617-542-8010
617-542-8028 Fax
cdelbaum@nclc.org

Last saved 7/8/2013 3:55 PM