**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
CAROL KULIG                                        )          No. Civ <u>1:13-cv-04715-PKC</u>
*on behalf of herself and all others similarly situated*)
     **Plaintiff**          )
               )
    **-v.-**                      )
**MIDLAND FUNDING, LLC,**                          )
**MIDLAND CREDIT MANAGEMENT, INC.**                )
**ENCORE CAPITAL GROUP, INC.**                     )
   **formerly MCM CAPITAL GROUP, INC.** )
**AMANDA PEREZ**                                   )
     **Defendants**         )
-------------------------------------------------------------x


**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY TRIAL COURT
PROCEEDINGS**

**I. Defendants' have the burden of demonstrating by competent evidence that there are no genuine issue of material facts regarding whether Plaintiff entered into a valid agreement to arbitrate this dispute.**

The Second Circuit standard to determine whether a claim is subject to arbitration under the FAA is "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." I*n re Am. Express Merchs.' Litig.*, 667 F.3d 204, 190 (2d Cir.2012) ("Amex III" ); *Schnabel v. Trilegiant*, 697 F.3d 110, 118 (2d Cir. 2012). "On a motion to compel arbitration, the moving party has the initial burden of showing that an agreement to arbitrate exists." Carvant Financial LLC v. Autoguard Advantage Corp., No. 13–CV–00872 (ADS)(AKT), 2013 WL 3991471, at *3 (August 5, E.D.N.Y. 2013) and must do so by admissible evidence,   See Dedon GmbH v. Janus et Cie, 411 F. App'x 361, 363 (2d Cir. 2011) , citing Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2855 (2010) ("Granite Rock reconforms this circuit's well-established precedent that where a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence"). Where the party is seeking to enforce an arbitration clause in a contract obtained by assignment, it must include proof of a full chain of assignment of that right in the specific account at issue. Webb v. Midland Credit Mgmt., Inc., 11 C 5111, 2012 WL 2022013 (N.D. Ill. May 31, 2012)("without Exhibits A through F, defendants cannot show an unbroken chain of assignment entitling them to stand in Citibank's shoes and enforce the arbitration provision contained in Webb's credit card agreement").

If the party resisting arbitration raises a genuine issue of material fact regarding whether the parties have agreed to arbitrate their dispute, the court must deny the motion to compel arbitration. *See Bensadoun v. Jobe–Riat,* 316 F.3d 171, 175 (2d Cir.2003) ("In the context of

motions to compel arbitration brought under the Federal Arbitration Act ..., the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." (citations omitted)). Accord, *Shetiwy v. Midland Credit Mgmt.*, 12 CIV. 7068 SAS, 2013 WL 3530524 at * 1 (S.D.N.Y. July 12, 2013); Carvant Financial LLC v. Autoguard Advantage Corp., No. 13–CV– 00872 (ADS)(AKT), 2013 WL 3991471, at *2 (August 5, E.D.N.Y. 2013). The party seeking arbitration must demonstrate "undisputed facts in the record require[ ] the issue of arbitrability to be resolved against the [p]laintiff as a matter of law…" *Shetiwy v. Midland Credit Mgmt.*, 12 CIV. 7068 SAS, 2013 WL 3530524 at * 1 (S.D.N.Y. July 12, 2013). In determining whether such disputed facts exist, "`[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the [summary judgment] motion.' *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989))." Carvant Financial LLC v. Autoguard Advantage Corp., No. 13–CV–00872 (ADS)(AKT), 2013 WL 3991471, at *2 (August 5, E.D.N.Y. 2013).

It will be shown below that Defendants have not met their burden for numerous reasons.

## II.   Defendants have not met their burden of demonstrating that Plaintiff agreed to arbitrate this dispute.

### A. Defendants must submit an authenticated cardmember agreement containing the purported arbitration agreement and by admissible evidence tendered by a competent witness of assignment of Plaintiff's specific account.

Absent proof of assignment, a debt collector cannot seek to compel arbitration from an agreement with the original creditor. *See, e.g. Britton v. Co–Op Banking Group,* 4 F.3d 742, 746 (9th Cir.1993) ("An assignee of a contractual right must prove the validity of his ownership

claims"); <u>Hagy v. Demers & Adams, LLC</u>, 2:11-CV-530, 2011 WL 5325486 at * 2, 3 (S.D. Ohio Nov. 2, 2011); *Webb v. Midland Credit Mgmt., Inc*, 11 C 5111 at 1, 2012 WL 2022013 (N.D. Ill. May 31, 2012); see *also Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co.,* 111 Ohio App.3d 713, 676 N.E.2d 1256, 1258 (Ohio Ct.App.1996) (quoting *Zwick v. Zwick,* 103 Ohio App. 83, 134 N.E.2d 733, 734 (Ohio Ct.App.1956) (" 'an assignee of a claim must allege and prove the assignment.' "). Other decisions bear out this general rule. *See e.g., U.S. Bank. v. Richards,* 189 Ohio App.3d 276, 938 N.E.2d 74, 77 (Ohio Ct.App.2010) (holding the real party in interest in foreclosure actions is the current holder of the note and mortgage and the failure to prove who is the real party in interest creates a genuine issue of material fact precluding summary judgment); *Buford v. Palisades Collection, LLC,* 552 F.Supp.2d 800, 809 (N.D.Ill.2008) (holding that, in a FDCPA case where the debt collector did not provide the court with the assignment or purchase contract between the debt collector and AT & T, the debt collector had not shown that it acquired all rights under the agreement).

It is well-established a party may introduce evidence that would otherwise be barred as hearsay if that evidence qualifies as a "business record" under the Federal Rules of Evidence, section 803(6).[1] Moreover, Plaintiff herein recognizes that, in some circumstances a party may

---

1 See <u>Ortho Pharm. Corp. v. Cosprophar, Inc.</u>, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) <u>aff'd,</u> 32 F.3d 690 (2d Cir. 1994) ("the relevant portion of Rule 803(6) provides: the following are not excluded by the hearsay rule, even though the declarant is available as a witness: **(6) Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness").

fulfill the requirements of 803(6) by incorporating the business records of another.[2]

    A key question to resolve, however, in determining whether records are admissible under 803(6), is whether the "records have sufficient indicia of trustworthiness to be considered reliable". <u>Saks Int'l, Inc. v. M/V Exp. Champion</u>, 817 F.2d 1011, 1013 (2d Cir. 1987). Trustworthiness of a record, or the lack thereof, can be established by: a) demonstrating the inherent reliability of the record itself[3]; or b) by demonstrating that the person introducing the record can show familiarity "with the record-keeping system of the business in question and [knows] how the records were created". <u>Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc.</u>, 10 CIV. 5715 DF, 2013 WL 3388427 (S.D.N.Y. July 1, 2013), quoting <u>Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence Manual</u>, § 16.07(2)(c) (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.) (2012). Incorporated business records that merely echo those of another "without some indicia of trustworthiness, cannot constitute 'regular business activity' that is admissible under Rule 803(6)". <u>Ortho Pharm. Corp.</u> at 1120-21. Indeed, "to hold otherwise would invite unscrupulous companies to analyze unfavorable data in a disingenuous way as part of their 'regularly conducted business activity,' thereby obtaining enormous advantages in future litigation". <u>Id.</u> at 1120.

    In *Ortho*, a pharmaceutical company attempted to introduce into evidence a series of "market surveys". *Id.* at 1118. The surveys were developed and created by the pharmaceutical

---

2 See <u>United States v. Jakobetz</u>, 955 F.2d 786, 801 (2d Cir. 1992), citing <u>Matter of Ollag Constr. Equip. Corp.</u>, 665 F.2d 43, 46 (2d Cir.1981) ("even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity").

3 "The court must be able to determine from some appropriate source—from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things—that the foundational element has been met." <u>Ortho Pharm. Corp. v. Cosprophar, Inc</u>., 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) aff'd, 32 F.3d 690 (2d Cir. 1994), quoting, <u>White Indus., Inc. v. Cessna Aircraft Co.</u>, 611 F.Supp. 1049, 1060 (W.D.Mo.1985).

company's in-house "market research department", which in turn had hired "independent contractors". *Id.* at 1119. At trial, the company tried to introduce the "market surveys" through the testimony of one of their employees. However, the court held that the surveys were inadmissible hearsay because: the testifying witness's knowledge of the surveys derived only from having been "briefed on its contents by his boss" an addressee "of the report"; and the testifying witness did not "appear on the face of the document as one of the Ortho employees to whom a courtesy copy was sent"; nor did the witness "commission the work" or "play any role in its preparation". *Id*. Under these circumstances, the court found that the company's witness was not a "person of knowledge", but also that the entire "trustworthiness" of the documents was "unclear because of the foundation that was laid". *Id*.

In *Webb v. Midland Credit Mgmt., Inc*, a debt collector Defendant (who is also one of the Defendants in this suit) attempted to prove that they were an assignee of a consumer debt and so could enforce an arbitration clause. 11 C 5111 at 1, 2012 WL 2022013 (N.D. Ill. May 31, 2012). In support of their position, the Midland Defendant submitted the declaration of "Pat Minford, Senior Manager of Business Development Process for Midland Credit, who, based on his personal knowledge and review of the business records of Midland Funding and Midland Credit," stated that "Citibank South Dakota, N.A" had assigned its interest in the consumer's account. *Id*. In the current case, Defendant's also base their assertion that they are entitled to enforce Chase's arbitration agreement on the declarations of (presumably) the same "Pat Minford". See Exhibit_. The *Webb* court held, as this Court should too, that that Minford lacked "personal knowledge of the procedure used to create and maintain" the documents he wished to introduce into evidence and that he was "not capable of testifying as a qualified witness". *Id*. at 5.

Minford's Declaration does not qualify for the business records exception because the declaration was not drafted as part of a regular business activity but specifically for this lawsuit, that is, to seek to compel Plaintiff's claim to arbitration.  "Documents prepared specifically for the subject litigation are "properly excluded because of motivational concerns arising from the fact that they were generated for litigation purposes," as opposed to records generated for business purposes." *LVNV Funding, LLC v. Mastaw*, M2011-00990-COA-R3CV, 2012 WL 1534785 (Tenn. Ct. App. Apr. 30, 2012) (quoting 2 Kenneth S. Broun, McCormick on Evidence § 288 (6th ed.2009)).[4]

Minford is certainly free to offer evidence that is based on his personal knowledge. However, if he is seeking to lay the predicate for the introduction of documents as a business record (particularly business records of a different company) or basing his testimony on the contents of those documents, then that is simply rank hearsay attempting to be slipped in through the business records exception.

Minford is not employed by the Seller of the accounts he seeks to authenticate, nor by the Buyer.  Rather, he is an employee of a third party, which was not a party to the transaction, Midland Credit Management.  MCM was given certain data on these accounts for one purpose and one purpose only: to collect on these accounts, through litigation if necessary.  If the fact that MCM incorporated these third party records into its own records for collection purposes makes them admissible on Minford's say-so as an exception to the hearsay rule, then so too could an attorney who is collecting for a creditor client be able to submit his own declaration to authenticate the client's records as incorporated into his office records.  Yet in both cases, the

---

4 In the case at bar, the affidavits executed by Griffin were clearly prepared specifically for the instant litigation, to trace the assignments of Mastaw's debt, establish LVNV's ownership of the debt and the amount due from Mastaw. They do not incorporate by reference or otherwise summarize or interpret documents that are prepared in the normal course of regularly conducted business activity.  *Id*.

declaration lacks indicia of trustworthiness.

> **B.      Fact questions remain as to whether MCM is able to admit putative records of Chase and MF, and those records create additional fact questions even if admissible.**
>
>> **1.      Defendants' own cases provide no support to the items at issue, and indeed demonstrate the glaring evidentiary deficiencies in the case at bar.**

Defendants cite to six unpublished district court cases, five of which they contend demonstrate that "courts nationwide" have "consistently" held that Midland could compel arbitration as an assignee of debt in response to claims challenging Midland's collection practices. [DE 14, p. 16] This is an overstatement. As described below, Courts have denied requests by MF and MCM to compel arbitration. Indeed, *Funderburke*, a case cited by Defendants, itself contains a lengthy discussion of a decision denying a motion to compel by MF, MCM, and Encore, *Webb v. Midland Credit Mgmt., Inc.*, 11 C 5111, 2012 WL 2022013 (N.D. Ill. May 31, 2012).

Moreover, Defendants' cases are either not relevant or actually demonstrate why Defendants have not met their burden to produce admissible evidence of the putative cardmember agreement as to Ms. Kulig, nor produced admissible evidence of the assignment of that specific account.

*Thompson* and *Olnickv*[5] are of no help to Defendants as to the issue of whether the parties entered into a valid agreement to arbitrate. *Thompson* (at * 7-12) dealt with whether Midland waived any right they may have had to compel arbitration, and whether the consumer had a contract defense of unconscionability to the arbitration agreement. *Olnickv* (at pp. 7, 8) also dealt with the contract defense of unconscionability, as well as whether the arbitration agreement was

---

5 *Thompson v. Midland Funding, LLC*, 2011 U.S. Dist. LEXIS 85746 (N.D. Miss. Aug. 3, 2011); *Olnickv. Fulton, Freidman & Gullace, LLP*, No. 11-cv-71, DE 70, (W.D. Tex. Oct. 13, 2011).

enforceable given that the sole arbitration company named in the agreement no longer existed. None of these items are at issue here, and thus these cases are of no help to Defendants. *Thompson* and *Olnicky* also raise issues as to whether an assignee may move to enforce an arbitration agreement with the original creditor. These issues will be addressed later in this memorandum under the topic of the scope of the arbitration agreement.

In *Bellows*, Midland was able to provide admissible evidence of the cardmember agreement because it produced an affidavit of the *original creditor* who issued the cardmember agreement. *Id*. at * 1. The affiant was able to authenticate the specific cardmember agreement sought to be used to compel arbitration as to that specific consumer. *Id*. The affiant had personal knowledge of the facts attested to either from personal knowledge or from HSBC's *own* business records.[6] *Id*. Unhelpfully, *Bellows* does not describe any evidence submitted to support Midland's claims of chain of title.[7]

---

6 Bellows at * 1:

> Midland has submitted the affidavit of Stuart Austin, the Bad Debt Sales Manager for HSBC Bank Nevada, N.A. (Petition at 9–10.) Austin declares Bellows opened an account with HSBC on July 22, 2003, that he was issued a credit card, and that as part of the issuance of the card, Bellows agreed to the terms of the Cardmember Agreement and Disclosure Statement (the "Agreement"). (Austin Decl., ¶ 2.) The declaration also authenticated the Agreement, which is attached as Exhibit A to the Petition. The declaration says Austin either has personal knowledge of the facts he declares, or that he obtained them from HSBC's business records.

7 Without citation, Bellows at * 2 summarily dismisses Plaintiff's "demands [for] better evidence of the chain of title, to show that Midland duly purchased his account" because "Bellows himself, in the complaint, alleged that Midland bought the account." In the case at bar, Ms. Kuligs makes no such allegation in her complaint. Indeed, the complaint contains several allegations that are inconsistent with a stipulation that MF actually owned title to Ms. Kulig's putative debt with Chase. *See* Original Complaint, DE 1, ¶ 5 ("MF is in the business of taking title *or claiming to take title* to charged-off debts allegedly owed by consumers and originally owed to others.) (emphasis added); ¶ 49 ("…the verified complaint [in the collection lawsuit] *contends* MF 'purchased a pool of charged -off accounts pursuant [sic] Purchase and Sale Agreement and Bill of Sale.'"); ¶ 82 ("The obligation MF *alleges* plaintiff owes is a "debt" [as defined by the FDCPA]") In any case, this would not relieve Defendants of their burden to demonstrate via admissible evidence the sale of the specific account of Ms. Kulig to MF  *See Starr v. Hameroff Law Firm, P.C.*, 2007 WL 3231988 at * 3 (D.Ariz.2007), *report and recommendation adopted by* 2008 WL 906822 (D.Ariz.2008)

> The Starrs argue the defendants are not the agents or assigns of Bank One. In reply, the defendants have provided the court with no evidence in support of their assertion that they are. They seem to imply that the plaintiffs have conceded this point by their course of conduct. Indeed, the instant complaint alleges that

*Shannon* is another example of how deficient Defendants' evidence of an arbitration agreement is in the case at bar. There too, unlike here, Midland produced a declaration from the original creditor.   While the opinion [DE 13-4 p. 3] is very terse as to the evidence of an arbitration agreement, it mentions not only an affidavit of Minford (the same affiant as in the case at bar), but also one from an officer of the original creditor, Citibank, who testified as to the record keeping practices of Citibank. "The Court further tentatively concludes Elizabeth Barnette's declaration provides sufficient evidence that the Card Agreement exemplar is the agreement applicable to Shannon." *Id*. In the case at bar, Defendants provide only the declaration from an employee of MCM; it provides no declaration from the putative original creditor. Ms. Barnette declared that the specific account of the specific consumer was sold to MF on a specific date. In the case at bar, there is no affidavit from the original creditor, much less on averring to their transfer of Ms. Kulig's specific account to MF.

### 2.      Contradictions in Defendants' purported evidence are indicia of lack of trustworthiness and cast doubt as to whether Minford is a "competent witness."

Defendants' evidence in support of their motion to compel arbitration is inconsistent, contradictory, and contains unexplained material omissions all of which are indicia of a lack of

---

Unifund CCR Partners obtained the Starrs' account from Bank One. This allegation, however, is just that—an allegation. The legal relationship between Unifund CCR Partners and Bank One is a matter within the knowledge of the defendants, not the plaintiffs. Accordingly, this allegation in the complaint was made not on personal knowledge but upon "information and belief." See Langadinos v. American Airlines, Inc., 199 F.3d 68, (1st Cir.2000) (Allegations may be made upon personal knowledge or on "information and belief."). It is entirely proper to make allegations on this basis in the complaint. They give the defendant notice of the plaintiff's claim and ordinarily allow the plaintiff to survive a motion to dismiss pursuant to Rule 12(b)(6). Fed.R.Civ.P. They are not, however, proof of a fact at issue. See, e.g., Fed.R.Civ.P. 56(e) (Allegations in the pleadings do not constitute facts sufficient to survive a motion for summary judgment.).

The allegations in the complaint do not prove the defendants are the agents or assigns of the original creditor. See Britton v. Co-op Banking Group, 4 F.3d 742, 744 (9th Cir.1993) (Contrary allegation in the complaint did not estop the plaintiffs from successfully challenging the defendant's status as an agent or successor in interest in its opposition to the defendant's motion to compel arbitration.). The defendants have provided no other proof on this issue. Assuming the arbitration clause is binding on the Starrs, the defendants have not shown it applies to the instant action.

trustworthiness.

### a.  The tendered Cardmember agreement post-dates Ms. Kulig's last use of the card.

Let us assume *arguendo* for a moment that the putative statements [DE 13-4] and putative cardmember agreement [DE 13-5] are admissible. These documents a*ffirmatively demonstrate* that the tendered credit card agreement cannot be the one governing Ms. Kulig's account. This is because the records Midland has tendered show the preferred cardmember agreement post-dates Ms. Kulig's use of the card.

It is black-letter law that an arbitration agreement cannot be enforced against a party who has not assented to the agreement.  In determining whether a party has assented to an agreement, "[t]he touchstone of the inquiry is the part[y's] outward manifestations of assent." *Schnabel*, 697 F.3d at 120. It is true that sometimes a party's mere *use* of a product may constitute assent to terms attached to that product.  *See Id.* at 122 (*citing Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1150 (7th Cir.1997) (consumer assented to "shrink-wrapped" terms).  But where, as here, there is no evidence that a party used the product after receiving the arbitration agreement, that party cannot be said to have agreed to arbitrate.  "In order to constitute acceptance, the failure to act affirmatively must carry a significance that reasonable people in the parties' positions would understand to be assent." *Schnabel*, 697 F.3d at 123.

The last time Ms. Kulig used her credit card was prior to May, 2006, according to Defendants' records. Defendants have produced credit card statements from May 2006 [DE 13-4 p. 2] until the putative date of charge off date of October 31, 2007 [DE 13-3 p. 2], and none of the statements show the use of the card by Ms. Kulig. Nor does Minford's affidavit assert any use after May, 2006.

Remarkably, the putative cardmember agreement is not dated. Defendants do not purport to offer *any* evidence of the date of the mailing of the putative cardmember agreement to Ms. Kulig, or when or if she received it.8 Although undated, the tendered cardholder agreement bears a 2007 copyright. [DE 13-5 p. 6] Further, the March 27, 2007 statement has a notice of change of terms [DE 13-4 p. 22, beneath "Important News" notice on bottom], stating that now the Average Daily Balance method will be used.  That in fact is the method stated in the tendered cardmember agreement [DE 13-5 p. 3, top right column under header of "Finance Change Calculation – Average Daily Balance Method") indicating that this standard Cardmember agreement was imposed on cardmembers after Ms. Kulig made her last payment on March 19, 2007. Therefore, the tendered cardmember agreement could not be the controlling agreement; if nothing else it creates a fact issue as to that point. This also is an "indicia" that the Minford Affirmation by MCM may lack "trustworthiness." As such it is another reason suggesting that Minford is not a competent witness to testify as to the accuracy and authenticity of the information and documents Minford contends Chase transferred to MF.

The mailing of the cardmember agreement is the offer, the use of the credit card is the the acceptance. Therefore, the 2007 cardmember agreement tendered [DE 13-5] could not be the controlling agreement.  The controlling cardmember agreement would need to have been created and mailed to Ms. Kulig sometime between when she was alleged to have opened the account, February 1, 1994 [DE 13-4 p. 2], and the date of last use, a date prior to March 27, 2006. In order to be bound by an arbitration provision inserted into a cardmember agreement, Ms. Kulig must have received the cardholder agreement, and accepted its terms by using the card without opting out of the arbitration provision. "Plaintiff accepted this invitation by failing to opt out and by

---

8 This omission is curious given how Midland, in the *Shannon* case, was able to provide an affidavit from the original creditor stating the precise date the cardmember agreement was sent in the Shannon case. Midland's failure to provide an affidavit from Chase is telling.

continuing to use his card." *Rockwell v. Chase Bank*, No. 10-1602 (RSL), 2011 WL 2292353 (W.D. Wash. June 7, 2011). "Plaintiff continued using the card after the effective date of the amendment, May 1, 2002, as evidenced from his account statements. *Johnson v. Chase Manhattan Bank USA, N.A.*, 784 N.Y.S.2d 921 (Sup. Ct. 2004) *aff'd,* 13 A.D.3d 322, 786 N.Y.S.2d 302 (2004). "Failure to comply with the terms of the opt-out provision and continued charges to the account operate as acceptance of the arbitration amendment under Delaware law." *Kurz v. Chase Manhattan Bank U.S.A., N.A.*, 319 F. Supp. 2d 457, 464 (S.D.N.Y. 2004).

  **b. Conflicting documentation as to the date of the putative sales agreement from Chase to MF.**

  What is the date of the putative contract between Chase and MF? The Bill of Sale is dated June 12, 2009. However, the "Agreement Date" listed on the "Closing Statement" [DE 13-2 p. 3] is April 12, 2009. This unexplained discrepancy in the contract dates is indicia of a lack of trustworthiness. There also is a "file creation date" of June 11, 2009 and a "closing date" of June 17, 2009. These terms are all undefined, and the relationships between them are not explained in any contract document produced. Again, this absence – particularly in the face of how readily available the full contract terms should be – is another indicia of lack of trustworthiness.

  **c. Minford does not even purport to authenticate certain important records.**

  Minford only specifically identified two documents – the bill of sale and the abstract of the excel spreadsheet – as "true and correct copies." He does not aver that *any* of the other documents are "true and correct copies." Importantly, he does not aver that the "sample" cardmember agreement or the credit card statements are "true and correct copies." He does not claim that Chase made such a representation to MF (much less to MCM), nor that the attached sample cardmember agreement is a true and correct copy of the cardmember agreement as to Ms. Kulig, the date of the cardmember agreement, the date mailed to Ms. Kulig, or whether Ms.

Kulig used the card after the sending of the cardmember agreement. In contrast, in the *Shannon* case discussed above, Citibank's officer, Ms. Barnette, testified as to the specific date of the specific cardmember agreement exemplar attached to the affidavit, testified that Ms. Shannon thereafter used the card (and thereby accepting the terms of the agreement), the specific date that Ms. Shannon used the card, and producing the credit card statement showing the same.  Since Defendants cannot prove that Ms. Kulig used the card after the mailing of the cardmember agreement, a prior cardmember agreement (not produced) would control.

These are the same types of omissions that led another court to find Midland's evidence insufficient to warrant granting its motion to compel arbitration. *Reimann v. Brachfeld, Midland et al*. Id. at * __ ("The Hannan declaration includes various exhibits, only two of which are identified by Hannan as "true and correct copies"…").

Therefore, Defendants do not meet their burden that there is no question of fact, *Bensadoun* at 775, whether the putative cardmember agreement they tender [DE 13-5] IS the controlling agreement as to Ms. Kulig's account.

**e.      Even assuming** Minford **were a "competent witness," Minford produces no business records from Chase that the tendered Cardmember Agreement governs Ms. Kulig's specific account.**

Mr. Minford avers that "The business records transferred by Chase in June 2009 also included a copy of the sample Cardmember Agreement applicable to the Account. A copy of that Cardmember Agreement is attached hereto as Exhibit 4." [DE 13-1 p. 3 ¶ 13] Assuming *arguendo* that Mr. Minton (as opposed to an affiant from Chase) is a competent witness to so aver, the affirmation is not enough for Defendants to meet their burden to foreclose a fact question as to whether the tendered cardmember agreement is the controlling agreement. It could

13

well be that the tendered agreement was the one Chase used as of the "file creation date" (June 11, 2009) [DE 13-2 p. 2] for the batch of accounts that MCM purports Chase sold MF, or for the charge off date for some or all of the accounts sold. The charge off date for Ms. Kulig is alleged to be October 31, 2007 [DE 13-3 p. 2]. In either instance, the cardmember agreement tendered would not be authenticated as the controlling agreement to determine whether Ms. Kulig's account was subject to arbitration and under what terms. Even if the alleged last payment date (March 19, 2007, [DE 13-3 p. 2]), as opposed to the date Ms. Kulig used the account to purchase goods or services (a date prior to March 27, 2006), were the controlling date for considering whether Ms. Kulig accepted the offer of the proposed cardmember agreement, Defendants would still have to prove the date the cardmember agreement tendered as evidence was mailed to and received by Ms. Kulig, and that the date was prior to March 19, 2010. Defendants purport to have no evidence to show a mailing date. This omission is troubling given how Midland, in the *Shannon* case, was able to provide an affidavit from the original creditor stating the precise date the cardmember agreement was sent to the consumer. The failure to provide the date of the mailing of the putative Cardmember Agreement was a reasons that Midland just last month lost a motion to compel arbitration in a California state court class action. *Reimann v. Brachfeld, [Midland Funding, et al]*, 2013 WL 5145784 at * 1-3 (Cal.Super.) (August 2, 2013).

   **f.    The Purchase Agreement may prevent MF and the other Defendants from compelling arbitration but has been inexplicably omitted.**

   The one page putative Bill of Sale [DE 13-2 p. 2] is only one page of a larger document that is the putative contract for the sale of accounts from Chase to MF. The Bill of Sale explicitly made "pursuant to the terms and conditions of Credit Card Account Purchase Agreement dated ___ …" The date of the referenced Purchase Agreement is inexplicably redacted. Moreover, the Purchase Agreement is not attached, nor is its absence explained.

It was Midland's failure to produce such a Purchase Agreement to its Bill of Sale that was a reason why the court in *Henggeler* denied its motion to compel arbitration in that class action. *Henggeler v. Brumbaugh & Quandahl, P.C., LLO [Midland Funding, LLC, et al]*, 894 F. Supp. 2d 1180, 1187-88 (D. Neb. 2012)("The documentary evidence of the sale is incomplete… Further, the sales agreement itself, though referenced in the bill of sale, was not attached and the one-page "closing statement" was extensively redacted.")

In *Buford v. Palisades Collection, LLC*, 552 F. Supp. 2d 800, 809-810 (N.D. Ill. 2008).[9] the Court denied a motion to compel an FDCPA class action to arbitration because it could not determine without seeing the entire assignment agreement whether the class action ban was one of the rights transferred from the original creditor to the debt buyer.. The transfer of "all rights, title, benefit and interest in the Debts" is not enough to show that the right to arbitrate was transferred without showing whether the rights transferred were subject to certain limitations. *Pine Top Receivables of Illinois, LLC v. Banco De Seguros del Estado*, 12 C 6357, 2013 WL 677986, * 3-5 (N.D. Ill. Feb. 25, 2013). *See generally Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17, 18 (2d Cir. 1997)(summarizing NY caselaw on partial assignments of rights to collect).

In sum, without Defendants' production of the entire sales contract – including the

---

9 Defendants, however, have not provided the Court with the assignment or purchase contract between Palisades and AT & T to clarify whether Palisades purchased all, or only part, of the Terms and Services agreement. As Palisades is a debt collector, but not a wireless services provider, AT & T's sale or assignment to Palisades would appear to be only partial, having to do with payments and charges, but not wireless service and usage… In this case, it is not at all clear that the class action waiver provisions in *810 the Welcome Guide were included in AT & T's assignment or sale to Palisades, the buyer of certain AT & T wireless communications debts. Drawing all reasonable inferences from the facts in Plaintiffs' favor, the Court finds that Defendants have not shown that Palisades acquired all rights that AT & T had with respect to the Terms and Services agreement—including the right to enforce the class action waiver provisions—when Palisades purchased Plaintiffs' wireless communications debts. Accordingly, Defendants' Rule 12(b)(6) motion to dismiss is denied. *Id.*

Purchase Agreement, they have not met their burden to show there is no fact question as to whether they were assigned all rights to the putative Cardmember Agreement.

### g.    Unexplained redactions plus the insertion of an unsworn statement.

The putative Bill of Sale [DE 13-2 p. 3] redacts the date of the Servicing Agreement, and does so for no apparent reason and with no explanation. The page following the Bill of Sale [DE 13-2 p. 3] is a one page document entitled "Closing Statement." There is no evidence of what the Closing Statement represents, or if it has any relationship with the Bill of Sale. A Closing Statement is not referenced in the Bill of Sale, in the Cardmember Agreement, or in the Minford Declaration.

There are columns in both Bill of Sale and the Closing Statement that have lines for entry of the same items of information, such as the "number of accounts" and the "total unpaid balance." That information is redacted from both documents for no apparent reason and with no explanation.  If the numbers varied between the two documents, then presumably the documents could not be referring to the same batch of accounts. The "file number" of the closing statement is also redacted. As noted previously the fact that "the one-page "closing statement" was extensively redacted" was a reason *Henggeler* denied Midland's motion to compel arbitration. *Id.* at 1187-88.

There is an unsworn statement at the bottom of the apparent data spreadsheet that purports to document Ms. Kulig's account as one of those being transferred by Chase [DE 13-3, p. 2]. to the statement is intended to explain the spreadsheet for this court, but it is not part of any records from Chase and is unsworn, and thus hearsay. It cannot be considered as part of Defendants' motion to compel arbitration.

**III.     Whether the Defendants comes within the scope of the arbitration agreement.**

The Court only reaches the issue of whether the disputes comes within the scope of the arbitration agreement if it concludes that there is no fact question whether the parties have entered into a valid agreement to arbitrate.  In the case at bar, the specific question is whether the parties – as opposed to the claims – fall within the scope of the arbitration agreement.

Should this Court overrule Plaintiff's evidentiary objections and proceed to the issue of the scope of the arbitration agreement, Plaintiff respectfully requests leave to amend her complaint to dismiss without prejudice Defendants MF. Without MF as co-Defendants, MCM Amanda Perez, and Encore would not fall within the scope of "Parties Covered" under the arbitration agreement, and their motion to compel arbitration should then be denied.

Defendants make only the most generalized statement to assert that the arbitration agreement would apply to each and every Defendant. "The Agreement makes clear, in multiple places, that it applies with equal force to any "assignee" or "purchaser" of the Plaintiffs Account, and that its unambiguous provisions apply to all affiliated entities and/or agents of the assignee purchaser." [DE 14 p. 16 ¶ 1]  However, the purported Cardmember Agreement was written with far more precision.

At the very beginning of the Cardmember Agreement [DW 13-5, p. 2, left column, ¶ 2] the terms "we", "us", and "our" are defined as follows. "Throughout this agreement, the words "we", "us", and "our" mean Chase Bank USA, N.A., the issuer of your credit card and account." The Arbitration section of the putative Cardmember Agreement uses a more specific definition of "we", "us", and "our" in defining the "Parties Covered" by the Arbitration provision [DE 13-5 p. 4, top right column]:

**Parties Covered.** For the purposes of this Arbitration Agreement, ***"we", "us",*** and "our" also includes our parent, subsidiaries, affiliates, licensees, predecessors, successors, ***assigns, any purchaser of your Account***, and all of their officers, directors, employees, agents, and assigns or any and all of the them. Additionally, "we", "us", and "our" ***shall include any third party*** providing benefits, services, or products in connection with the Account (Including but not limited to credit bureaus, merchants that accept any credit device issued under the Account. rewards programs and enrollment services, credit insurance companies, ***debt collectors***, and all of their officers, directors, employees, agents and representatives) ***if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.***

The first sentence of the "agreement would therefore encompass MF as one of the "Parties Covered" if the Court concluded that there was no fact question as to whether MF was an "assign… [or] purchaser" of Ms. Kulig's account. Defendants may argue, looking solely at the first sentence, that they are one of MF's "affiliates, licensees… employees, [or] agents…" However, it is the second sentence not the first that would control as to MCM and Perez because the second sentence has more specificity. As a general rule of construction, where a contract specifies different rights to different specifically mentioned entities, the contract must be interpreted to require that specificity. The second sentence states " "we", "us", and "our" shall include any third party providing… services… with the Account (Including but not limited to… debt collectors…) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us. MCM and Perez would each be a "third-party," a subcategory of "us", because they would fall under the more specific term of "debt collector" under the second sentence than the more generalized terms in the first sentence.

Therefore, MCM and Perez would only be a one of the "Covered Parties" of the arbitration provision "if, and only if such a third party [MCM and Perez]" is named as a "co-defendant in any Claim you assert against us." The use of the word "us" at the end of the last sentence is the "us" as defined in the first sentence of the "Parties Covered" paragraph, either Chase or MF as the "assign" or "purchaser" of the account. Courts have analyzed Cardmember Agreement language that contain nearly identical language the language at bar. In those cases, where and FDCPA class action was brought solely against the law firm for the assignee, but not the original creditor or the assignee of the original creditor, then the motion to compel arbitration was denied as the law firm was considered a "third-party" because it was a "debt collector." *Karnette v. Wolpoff & Abramson, L.L.P.*, 444 F. Supp. 2d 640, 645 (E.D. Va. 2006). However, when FDCPA class actions have been brought not just a "third-party" (either a law firm or a servicer who meet the definition of "debt collector"), but also against the debt collector who is the assignee of the account and thus steps into the shoes of the original creditor, then courts have compelled arbitration. *Bontempo v. Wolpoff & Abramson, L.L.P.*, CIV.A. 06-745, 2006 WL 3040905 (W.D. Pa. Oct. 24, 2006); *Montalbano v. Cavalry Portfolio Servs.*, LLC, 2:12-CV-01471, 2013 WL 593988 at * 5 (W.D. Pa. Feb. 15, 2013).

Importantly, even though Encore is a parent of MF, it does not get to step into the shoes of Chase in the way that MF may be able to. Again, the plain text of the "Parties Covered" provision controls. Again, the generalized use of the term "we", "us", and "our" on the first page of the Cardmember Agreement defined those terms as "Chase." The first sentence says that, "For purposes of this arbitration agreement" the term means "our parent, subsidiaries, affiliates, licensees, predecessors, successors, ***assigns,  any purchaser of your Account***, and all of their officers, directors, employees, agents,   and assigns or any and all of the them." Note the

disjunctive use. The term "us" prior to the word "assigns" meant Chase (as defined on page 1 of the Cardholder Agreement), and Chase' "parent, subsidiaries, [or] affiliates." The terms "parent, subsidiaries, [or] affiliates" only applies if the "us" is limited just to Chase. The term   "parent, subsidiaries, [or] affiliates" does not apply to the "assigns, any purchaser of your Account." Rather, it is only the "officers, directors, employees, agents, and assigns" of the "assigns, any purchaser of your Account." For this reason, Encore is not included in the use of the word "us" that is the last word of the last sentence of the "Parties Covered" section.

<div style="margin-left: 40%;">

Respectfully submitted,
/s/
Ahmad Keshavarz
THE LAW OFFICES OF AHMAD KESHAVARZ
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:     (877) 496-7809 (toll-free)
Email: ahmad@NewYorkConsumerAttorney.com


NATIONAL CONSUMER LAW CENTER, INC.

Charles M. Delbaum, Esq. (to be admitted pro hac vice)
Arielle Cohen, Esq. (to be admitted pro hac vice)
7 Winthrop Square, 4th floor
Boston, MA 02110
617-542-8010
617-542-8028 Fax
cdelbaum@nclc.org
ariellecohen@nclc.org

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Defendants
MIDLAND FUNDING, LLC;
MIDLAND CREDIT MANAGEMENT, INC;
ENCORE CAPITAL GROUP, INC; and
AMANDA PEREZ
By and through their attorney of record

Charles P. Greenman;
Kevin P. Wallace;
Troutman & Sanders, LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

Date:  September 25, 2013
       Brooklyn, NY
/s/
Ahmad Keshavarz
Plaintiff's Attorneys