USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-13-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CAROL KULIG,

       Plaintiff,      13 Civ. 4715 (PKC)

  -against-

               MEMORANDUM
               AND ORDER

MIDLAND FUNDING, LLC, MIDLAND CREDIT
MANAGEMENT, INC. ENCORE CAPITAL GROUP,
INC. formerly MCM CAPITAL GROUP, INC.,
AMANDA PEREZ,

       Defendants.
-----------------------------------------------------------x

CASTEL, District Judge:

    Plaintiff Carol Kulig, a credit card holder, asserts claims on behalf of herself and others similarly situated against Midland Funding, LLC, Midland Credit Management, Inc., Encore Capital Group, Inc., and Amanda Perez (collectively, "Midland"). Plaintiff brought a putative class action under the Fair Debt Collection Practices Act ("FDCPA") and certain New York statutes. Pursuant to the terms of an agreement defendants claim applies to Ms. Kulig's account, defendants have moved to compel the arbitration of her claims. For the reasons set forth below, defendants' motion is denied.

I. BACKGROUND

    Midland Funding ("MF") is a Delaware corporation in the business of taking title to charged off debts and filing suit to collect on them. (Compl. ¶5) Midland Credit Management ("MCM") is the servicer for MF and is responsible for taking affirmative steps to collect on debts purchased by MF. (Compl. ¶ 13) These steps include sending letters, making collection phone

calls, and filing collection lawsuits in the name of MF. Id. Both MF and MCM are wholly-owned subsidiaries of Encore Capital Group, Inc. ("Encore"), a public company listed on the NASDAQ stock exchange. (Compl. 16-17) Together, MF, MCM, and Encore operate as a joint venture to purchase and collect on putative debts from consumers. (Compl. ¶ 25 (quoting Encore Form 8K, March 6, 2013, Ex. 99.1)) Amanda Perez is an attorney employed by MCM who serves as an "in-house counsel" for MF. (Compl. Ex. E)

Kulig's lawsuit stems from Midland's efforts to collect on a credit card debt that she allegedly owed to Chase Bank USA, NA ("Chase"). (Compl. ¶¶ 44-70) At some point prior to 2006, Kulig opened a credit card account with Chase. (Dkt. No. 17-3; Dkt. No. 33-1 at 3). Kulig used the account to make purchases and to obtain cash advances prior to April 2006, and made payments on the outstanding account balance until March 2007. (Dkt. No. 17-3) Pursuant to a Bill of Sale dated June 2009, the account was sold and assigned by Chase to MF. (Dkt. No. 17-1; Dkt. No. 32-2) On August 1, 2012, MF brought suit in New York Civil Court seeking to collect on Kulig's credit card debt. (Compl. Ex. E) In January 2013, Kulig retained counsel and ultimately obtained a discontinuance with prejudice of the collections suit, on grounds that the suit was time-barred under New York law. (Compl. ¶ 66)

Subsequently, Kulig brought claims against Midland under the FDCPA, 15 U.S.C. § 1692 et. seq., the New York General Business Law § 349 et. seq., and the New York Judiciary Law § 487 et. seq. (Dkt. No. 1) Kulig seeks certification of a class of similarly situated plaintiffs, alleging that Midland systematically filed and litigated time-barred lawsuits against hundreds of individuals in New York State in violation of state and federal law. (Compl. at 1) On August 19, 2013, Midland sent Kulig's counsel a formal demand to elect individual arbitration of the claims in the Complaint. (Dkt. No. 18-1) Midland claims the right to so elect

based on the terms of a form contract (the "Cardmember Agreement") that they claim governs the relationship between the parties in the instant suit. Id. Kulig did not respond to Midland's demand. (Dkt. No. 18 at ¶ 4) On September 5, 2013, Midland filed a motion to compel arbitration. (Dkt. No. 16)

II. STANDARD FOR COMPELLING ARBITRATION

Midland asserts that section 3 of the Federal Arbitration Act ("FAA") mandates that this action be stayed and that the parties be compelled to arbitrate their claims. 9 U.S.C. § 3. On a motion to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). Thus, "[i]f undisputed facts in the record require[] the issue of arbitrability to be resolved against the Plaintiff as a matter of law," then a district court must compel arbitration. Id. On the other hand, "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Id. (citing 9 U.S.C. § 4). Such "a trial is warranted only if there exists one or more genuine issues of material fact regarding whether the parties have entered into such an agreement." Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012) (citing Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 369 (2d Cir. 2002))

In this Circuit, courts apply a conjunctive two-part test to determine arbitrability of claims, asking: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011). A party resisting arbitration on grounds that the arbitration agreement is invalid under a defense to contract formation, or that the arbitration contract does not encompass the claims at issue, bears the

3

burden of proving such a defense. See Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 92 (2000). However, "[a]rbitration is strictly a matter of consent," and thus courts should order arbitration of a dispute only when satisfied that the actual formation of the parties' arbitration agreement is not in issue. Granite Rock Co. v. Int'l Bhd. of the Teamsters, 130 S.Ct. 2847, 2857-58 (2010). "Granite Rock confirms this Circuit's well-established precedent that where a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence." Dedon GmbH v. Janus et cie, 411 Fed. Appx. 361, 363 (2d Cir. 2011). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." Bensadoun, 316 F.3d at 175 (citation and quotations omitted). It is the court's duty to interpret and construe an arbitration provision, but only where a contract is "validly formed" and "legally enforceable." Granite Rock at 2859-60.

III. DISCUSSION

    A.    <u>Acceptance of the Arbitration Provision</u>

Kulig argues that there is no evidence that she agreed to arbitrate her claims. "Whether or not the parties have agreed to arbitrate is a question of state contract law." Schnabel, 697 F.3d at 119.

On its motion to compel, Midland has submitted a document it claims is "the sample Cardmember Agreement applicable to [Kulig's] Account." (Dkt. No. 17 at ¶ 13; Dkt. No. 17-4) Kulig argues that this Cardmember Agreement cannot govern her account because the agreement postdates her last use of the account. Though the Cardmember Agreement is not dated, the final page of the document submitted by Midland cites interest rates calculated based

4

on the Prime Rate as of March 22, 2007. (Dkt. No. 17-4 at 6; see also id. at 2 ("we calculate the APR by adding a margin to the Prime Rate published in The Wall Street Journal two business days before the Closing Date shown on your billing statement.")) Midland has submitted Chase statements relating to Kulig's account, which indicate that her last purchases on the account were made prior to April 2006 and that her final payment on the account balance was made on March 19, 2007. (Dkt. No. 17-3). Kulig argues that in no sense did she "use" the account after March 19, 2007, and therefore she cannot be held to have assented to the terms of a later-dated agreement.

Midland did not claim to be in possession of an earlier-dated contract with Ms. Kulig. Instead, Midland argues that the contract it produced amended some earlier Cardmember Agreement, which it implies Kulig must have accepted by opening the account and using her card. Midland contends that because the Cardmember Agreement calls for the application of Delaware law to this dispute, the fact that Kulig made no use of the account following the change in terms is irrelevant. According to Midland, a provision of Delaware law allows banks to unilaterally amend the terms of agreements governing revolving credit plans. 5 Del. C. § 952(a).

Midland assumes that Delaware law applies to Kulig's claims, presumably based on the choice of law provision in the very Cardmember Agreement containing the arbitration provision. (Def. Reply Mem. at 4; Dkt. No. 17-4) Contrary to Midland's assumption, Delaware law does not necessarily apply to the issue of contract formation. "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 332 (2d Cir. 2005). This is so because "[a]pplying the choice-of-law clause to resolve the contract formation

issue would presume the applicability of a provision before its adoption by the parties has been established." Schnabel, 697 F.3d 110, 119 (2d Cir. 2012).

In addressing choice of law rules in a federal question case, the Court should invoke federal common law choice of law analysis only where "significant federal policy, calling for the imposition of a federal conflicts rule, exists." In re Gaston & Snow, 243 F.3d 599, 607 (2d Cir. 2001). Because this issue of contract formation does not implicate a significant federal policy and "hinge[s] upon state law," New York choice of law rules govern this dispute. Id. at 605.

In New York, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws. Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing Matter of Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 223 (1993)). "Laws are in conflict '[w]here the applicable law from each jurisdiction provides different substantive rules.'" Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) (citing Curley, 153 F.3d at 12). Delaware law provides a statutory procedure governing contract formation with respect to provisions added by amendment; this procedure allows for unilateral amendment of an existing contract provided certain notice requirements are satisfied. 5 Del. C. § 952. In contrast, New York law includes no such provision; contract formation and amendment is instead governed by common law principles. Thus, an actual conflict exists between the laws of Delaware and New York, and a choice of law analysis is necessary.

New York rules apply a "center of gravity" analysis when deciding which state's law to apply to determine the validity of a contract's formation. See Jimenez v. Monadock Constr., Inc., 109 A.D.3d 514, 516 (2d Dep't 2013); see also Alderman v. Pan Am World

6

Airways, 169 F.3d 99, 103 (2d Cir. 1999) ("Under New York's choice-of-law rules, the interpretation and validity of a contract is governed by the law of the jurisdiction which is the 'center of gravity' of the transaction."). The most significant factors in resolving a choice of law dispute are (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domiciles of the contracting parties. See Equis Corp. v. Mack–Cali Realty Corp., 6 A.D.3d 264, 266 (1st Dep't 2005) (citing Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994)).

Applying the foregoing factors, the place of contracting is unclear from the record. The place of negotiation is also unclear; in any event, because this inquiry concerns a form contract applicable to a consumer credit card account, this factor carries little weight given the likely absence of any negotiation. As for the place of performance and location of the contract's subject matter, Kulig opened her account, used her credit card to obtain cash advances, and made payments on her outstanding balance in the state of New York. (Dkt. No. 17-3) Because the statements provided by Midland do not cover the period during which actual purchases were made, it is unclear whether the purchases were made in New York. Id. Ms. Kulig is a resident of New York. (Compl. ¶ 3) Chase Bank NA, USA, the counterparty to the contract, is a Delaware corporation. (Dkt. No. 17-3, 17-4) Although the record as it stands indicates that New York law likely applies to the issue of contract formation, the Court needs not resolve this issue because the same result would follow under the law of either state.

1. Delaware Contract Law

A Delaware statutory provision concerning the amendment of agreements governing revolving credit plans allows banks to unilaterally amend such agreements, provided that certain notice requirements are met. 5 Del. C. § 952. That statute provides in part:

7

> Unless the agreement governing a revolving credit plan otherwise provides, a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to plan benefits or features . . . arbitration or other alternative dispute resolution mechanisms, or other matters of any kind whatsoever . . . . Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower.

Id. at 952(a). This broad right to amend is subject to some limitations. In order to effect a unilateral amendment pursuant to the statute, the issuer bank must notify the cardholder of his or her right to opt out by sending written notice of the borrower's rejection of the amendment to the bank at a provided address. Id. at 952(b)(1)-(2). The statute requires that the borrower be given a minimum of fifteen days to give notice of rejection to the bank, and also provides that use of the account after the fifteen-day period constitutes acceptance even if the borrower has provided notice of rejection. Id.

Although the introductory clauses of sections 952(b)(1) and (2) refer to amendments increasing the rates of periodic interest, Delaware courts applying this statute have applied the more detailed notice requirements therein to contract amendments adding or modifying arbitration provisions. See Edelist v. MBNA Am. Bank, 790 A.2d 1249, 1257-59 (Del. Super. 2001); Pick v. Discover Fin. Servs., Inc., 2001 WL 1180278, at *4 (D. Del. 2001); Kurz v. Chase Manhattan Bank USA, N.A., 319 F.Supp. 2d 457, 463 (S.D.N.Y. 2004) (citing Edelist).

Thus, while section 952 does provide credit card issuers with a broad right to amend their contracts with debtors, the right is not unlimited; rather, it is qualified by a requirement of compliance with notice requirements. Here, Midland has provided no evidence

8

that any notice of an amendment containing the arbitration clause at issue was mailed to Kulig at any point. Further, Midland concedes that none of the eighteen account statements they provided includes any such notice. (Def. Reply Mem. at 6) Cases upholding the existence of a validly executed amendment under section 952 include affirmative evidence in the record indicating that the requisite notice, which includes an opportunity to opt-out, was sent to the cardholder. See, e.g., Edelist, 790 A.2d at 1258 (quoting the language of a notice of amendment and opt-out provision, which an MBNA affiant stated was sent to plaintiff on a specific date); Kurz, 319 F. Supp. 2d at 464 (citing the affidavit of a Chase employee describing Chase's system tracking communications to customers and averring that the system indicated that a form notice adding an arbitration provision was mailed to plaintiff on a specific date); Pick, 2001 WL 1180278, at *1 (quoting a specific, dated notice of amendment adding an arbitration clause which an affiant at Discover Bank stated was sent to plaintiff on a specific date and further citing Discover's extensive quality control procedures for ensuring that specifically-numbered amendments are delivered to cardholders); Grasso v. First USA Bank, 713 A.2d 304, 306-07 (Del. Super. 1998) (quoting a notice of amendment attached as an exhibit to the affidavit of a First USA Bank vice president); Marsh v. First USA Bank, N.A., 103 F.Supp.2d 909, 917-19 (N.D. Tex. 2000) (bank established by affidavits, deposition testimony, and documents that it provided detailed notice to credit cardholders that it was amending its cardholder agreement to add an arbitration clause). Against this legal background, Midland has produced neither the language or date of any notice of amendment pertaining to an arbitration clause, nor any evidence that such notice was mailed to Kulig at any point. Merely submitting a generic sample agreement that postdates an accountholder's last active use of an account does not demonstrate compliance with the notice requirements under Delaware law.

9

Midland further argues that Chase has used an arbitration provision identical to the one found in the Cardmember Agreement since 2005, thus urging the Court to assume that the same provision was part of some contract that Kulig assented to when she used her account prior to March 2007. In support of this contention, Midland cites a single case quoting an identical arbitration clause in a 2005 Chase Cardmember Agreement. Krutchik v. Chase Bank USA, N.A., 531 F. Supp. 2d 1359, 1362-63 (S.D. Fla. 2008). The contract terms applicable to a different debtor and a creditor, neither of whom are before this Court, do not control the issue of the terms agreed upon by Ms. Kulig, particularly because Midland cites no evidence (aside from this single case) for its contention that all Chase credit card accounts opened since 2005 have been governed by the same arbitration clause at issue here.

Thus, even if Delaware law were to be applied, Midland nevertheless would have failed to come forward with evidence which, if believed, would show that Ms. Kulig agreed to the arbitration provision.

2. New York Contract Law

Unlike Delaware law, New York law does not provide banks with a statutory right to unilaterally amend revolving credit agreements. In New York, "[f]undamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 354 (2d Dep't 1980). "No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 228 (2d Cir. 2001) (quoting Corbin on Contracts § 1293 (1962)). "The manifestation of expression of assent necessary to form a contract may be by word, act, or

10

conduct which evinces the intention of the parties to contract." Maffea v. Ippolito, 247 A.D.2d 366, 367 (2d Dep't 1998).

Although the use of a credit card constitutes acceptance of an offer of credit, see Feder v. Fortunoff, 114 A.D.2d 399 (2d Dep't 1985), merely continuing to owe money on a credit card account cannot reasonably be understood to be an "objective manifestation of intent" that binds the parties to a change in terms. See Zheng v. City of New York, 93 A.D.3d 510, 511 (1st Dep't 2012). An outstanding balance on a credit card, without more, is simply a debt attributable to past uses of the card rather than a use in and of itself.

Midland relies on Herrington v. Union Planters Bank, N.A., 113 F. Supp. 2d 1026, 1031 (S.D. Miss. 2000) to argue that Kulig's keeping the account open and maintaining a debt amount to a "use" of the account sufficient to constitute acceptance of the proffered Cardmember Agreement. First, in Herrington, the court explicitly stated that the consumer was mailed a letter along with a copy of the revised agreement containing the arbitration provision. Id. at 1028. The court rejected plaintiffs' argument that they never assented to the change in terms not merely because they maintained their accounts, but because they did so after it was "undisputed that the plaintiffs were given notice . . . that their accounts were being revised to include an arbitration clause." Id. at 1031. Moreover, the account at issue in Herrington was a deposit account, not a revolving credit account. To maintain a deposit account with a bank is to "use" such an account to store one's assets in a federally insured safe house, to earn interest on the assets, and to have access to the assets through the bank's network. This contrasts with an unpaid balance on a credit card account, which, without more, is merely a debt attributable to past uses of the account.

Midland has failed to come forward with evidence which, if believed, demonstrates that Ms. Kulig manifested her assent to the terms of the March 22, 2009 Cardmember Agreement, including the arbitration provision. Thus, under both the common law principles of New York contract law and the applicable statutory provision of Delaware law, Midland has failed to create a genuine issue of material fact as to whether a valid agreement to arbitrate was formed.

B. Scope of Denial

Midland has conditionally requested that if the Court declines to compel arbitration of Kulig's claims, the Court refrain from denying its motion to compel arbitration and instead order further discovery on issues still in dispute. To support this request, Midland relies on Bensadoun, 316 F.3d at 175 ("If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."). Under the FAA, "[i]f the making of the arbitration agreement [ . . . ] be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4." However, such "a trial is warranted only if there exists one or more genuine issues of material fact regarding whether the parties have entered into such an agreement." Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012) (citing Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 369 (2d Cir. 2002)). Moreover, in Bensadoun the Second Circuit remanded the case not to hold a mini-trial on arbitrability but rather to determine substantive issues underlying the case prior to reaching a final decision on arbitrability. 316 F.3d at 178. This contrasts with the instant motion, where plaintiff's substantive claims are not at issue but the issue of validity of contract formation has been before the Court from the outset of the motion.

The record in this case indicates only that, at an unknown point prior to 2006, Kulig opened a credit card account with Chase, and that a "sample" Chase "Cardmember Agreement" published on or after March 22, 2009 included an arbitration clause. The sole link between that agreement and Kulig's account is a declaration by Patrick Minford, a Midland employee, stating that "[t]he business records transferred by Chase in June 2009 also included a copy of the sample Cardmember Agreement applicable to [Kulig's] Account." (Dkt. No. 17 at ¶ 13) There is no indication that Minford's knowledge on this point had any basis beyond his reading of the document, and nothing in his declaration or the four attached exhibits indicates otherwise.

In the course of briefing, Midland sought and obtained an affidavit from an authorized Chase representative indicating that Kulig had an account with Chase and that the account was sold and transferred to MF on June 11, 2009. (Dkt. No. 32-2) Moreover, at a September 26, 2013 pre-trial conference, the parties agreed before the Court to engage in limited discovery concerning arbitration-related issues; Midland did in fact obtain and file a set of discovery responses from Kulig. (Dkt. No. 33) Thus, despite having multiple meaningful opportunities to obtain evidence indicating the contractual terms actually applicable to Kulig's account, Midland failed to produce any evidence on this issue. Given this context, the Court declines Midland's request to order more extensive discovery on this issue.

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (citing Almacenes Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir.1945)). Midland has failed to meet their burden in this case. Thus, their motion to compel arbitration must be denied.

13

CONCLUSION

For the reasons stated above, defendants' motion to compel arbitration and stay plaintiff's complaint (Dkt. No. 16) is denied. Plaintiff's motion for leave to file sur-reply (Dkt. No. 35) is denied as moot, as neither it nor the content of Defendants' Memorandum in Opposition to Plaintiff's Motion for Leave to File Sur-Reply were relied upon in the disposition of the instant motion. Defendants are directed to file an answer to plaintiff's complaint within fourteen (14) days.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       November 13, 2013