USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-20-14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CAROL KULIG, on behalf of herself and all others similarly situated,

                Plaintiff,

-against-

MIDLAND FUNDING, LLC, MIDLAND CREDIT MANAGEMENT, INC., ENCORE CAPITAL GROUP, INC. formerly MCM CAPITAL GROUP, INC., and AMANDA PEREZ,

                Defendants.
-----------------------------------------------------------x

13-cv-4715 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

        In a Memorandum and Order dated September 26, 2014, this Court denied plaintiff Carol Kulig's motion to certify a class of individuals against whom she alleges the defendants (collectively, "Midland") systematically filed time-barred debt collections lawsuits. 2014 WL 5017817 (S.D.N.Y. Sept. 26, 2014). The Court did so because it concluded that Kulig's counsel, Ahmad Keshavarz, would not be able to "fairly and adequately represent the interests of the class," as required by Rule 23(g)(4), Fed. R. Civ. P. Kulig now moves for reconsideration of the order, or to alter the order pursuant to Rule 23(c)(1)(C). For the following reasons, her motion is denied.

        "An order that grants or denies class certification may be altered or amended before final judgment." Rule 23(c)(1)(C), Fed. R. Civ. P. "District courts have ample discretion to consider . . . a revised class certification motion after an initial denial," In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 (2d Cir. 2006), and may revisit a prior decision on certification if the movant has identified "compelling reasons such as an intervening change of

controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." In re J.P. Morgan Chase Cash Balance Litig., 255 F.R.D. 130, 133 (S.D.N.Y. 2009) (quoting Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008)).

The Court's decision to deny certification was based in large part on Keshavarz's failure to communicate a settlement offer to his client. In his reply brief in support of the motion for certification, Keshavarz conceded that he had failed to communicate an offer, but argued that "[t]here was no point in [doing so] when Midland had not yet provided the responses to discovery requests that counsel needed in order to completely evaluate the offer and advise Ms. Kulig about it." (Pl.'s Reply Br. in Supp. of Class Certification 7.) The Court noted that this did not appear to be "an instance of an inadvertent lapse in communication." 2014 WL 5017817, at *4. It stated, further, that Kulig "can be expected to know what injury she suffered," and should have been able to evaluate the offer from Midland herself, without any need for additional document discovery. Id.

Keshavarz now clarifies that there were in fact two settlement offers: an individual offer of settlement of $20,000, made on January 31, 2014, and an offer to the class, made on June 17, 2014. (Pl.'s Mem. 1–2.) He claims that he in fact communicated the first offer, and that Kulig rejected it. (Dkt. No. 115, ¶ 4.) The passage from the reply brief quoted above, he states, actually referred to the class-wide settlement offer. Moreover, he claims that the failure to transmit that offer (which he concedes) was inadvertent (id. ¶ 7), and that the passage, rather than serving as a justification for the failure, attempted only to show that the failure did not harm the interests of the class.

In support of his contention that he communicated the $20,000 offer, Keshavarz has submitted his own declaration (Dkt. No. 115), but no declaration or affidavit from Kulig

- 2 -

herself.  The only sworn statements from Kulig on the subject are the following extracts from her July 15, 2014 deposition:

> Q: Are you aware of whether the defendants previously offered to settle this case with you for $20,000?
>
> MR. KESHAVARZ: Objection to the form.
>
> A: I just need to ask—I don't know myself.
>
> Q: Is that familiar to you that the defendants previously offered to settle this case for $20,000 with you?
>
> A: I just need to ask my attorney.  This is something that he knows, not me.
>
> Q: Have you ever heard the $20,000 settlement offer in connection with this case?
>
> A: He may have mentioned it at some point.  But I don't know what really happened to me.
>
> Q: You say what really happened to you, what do you mean by that?
>
> A: I mean whether I should or would get any money.  But I am told by my attorney because these are things that you all understand but not me.
>
> Q: Sitting here today, are you aware that a settlement offer for $20,000 was previously made in this case to you to settle this case on an individual basis?
>
> A: As I say, I don't know what that means, and I have to ask my attorney.
>
> Q: What about that is unclear to you?
>
> A: As I say, it's just something that's [sic] my attorney knows, but I don't.
>
> Q: So is it your testimony that you did not know of the prior offer to settle the case for $20,000?
>
> MR. KESHAVARZ: Objection; form.  That's not at all what she said.
>
> A: I say things have changed because it used to be just me, and then it became 2,000 people.  So I don't know how it's going to work finally.
>
> Q: I am just asking you the question.  I won't try to restate your prior testimony.
>
> A: But as I said, I don't understand the answer to the question you are asking me.
>
> Q: I am trying to make it clear.  Have you ever been told previously in this case that the defendants had made an offer to settle in the amount of $20,000?

> MR. KESHAVARZ: Objection to the form.  If you know the answer to the question, were you told about an offer of settlement in this case?
>
> A: Yeah.  I may have heard something.  But I don't remember exactly what it was.
>
> Q: Do you know when you may have heard something?
>
> A: Well, in the past few years when I have been visiting my attorney I got various information.
>
> Q: Well, I am asking specifically about the settlement offer.  And you say you may recall hearing about it.  I am asking if you can place that potential recollection in time if you have any idea?
>
> A: As I said, I don't know the basic answer to that.  I mean, something like that may happen.  I don't know.

(Dkt. No. 71 Ex. B at 203:1–205:22 ("Kulig Dep.").)

> Q: We were talking just a little bit about a prior settlement offer in the amount of $20,000.  Do you recall having any conversation—I don't want to know the substance—do you recall having any conversations with your attorney about that settlement offer?
>
> MR. KESHAVARZ: Do you remember talking about a settlement?  Without going into the details, do you remember it or not?
>
> A: I don't remember it very well but I could ask my attorney again.  It's not something that I understand as I mentioned before.

(Id. at 211:21–212:11.)

This testimony neither provides direct support for Keshavarz's version of events nor directly contradicts it.  But in any event, the Court need not attempt to determine whether Keshavarz's account is truthful.  If it is not, then Keshavarz's deception simply adds to the basis for the Court's original conclusion that he could not adequately represent the class.  If Keshavarz did transmit the $20,000 offer to Kulig, then Kulig's apparent failure to remember that this happened and professed inability to understand the simple question whether it did raise doubts about her adequacy as a class representative.

- 4 -

A plaintiff seeking to represent a class must show that he or she will "fairly and adequately protect the interests of the class." Rule 23(a)(4), Fed. R. Civ. P. "[C]lass certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077–78 (2d Cir. 1995) (alteration and quotation marks omitted). Although the Second Circuit has noted that attacks on the adequacy of a class representative based on his or her ignorance are generally disfavored, see Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 61 (2d Cir. 2000), courts in this District have continued to deny class certification when the purported representative's knowledge of the case falls below a relatively modest standard. See In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135–36 (S.D.N.Y. 2008) (finding inadequacy where a representative did not know the name of the stock at issue, the name of either individual defendant, whether he had ever seen any complaint in the action, and that a defendant had moved to dismiss); Scott v. N.Y. City Dist. Council of Carpenters Pension Plan, 224 F.R.D. 353, 355–57 (S.D.N.Y. 2004) (finding inadequacy where the representatives did not know what allegations were contained in the complaint, what a class representative was, who was part of the class, and what the lawsuit concerned).

The extract from Kulig's deposition quoted above is unfortunately typical of the deposition as a whole. Throughout, Kulig demonstrates great uncertainty about the facts underlying this lawsuit, and professes near-total reliance on Keshavarz. (See, e.g., Kulig Dep. 73:5–14 ("Q: Do you know what claims or what the legal basis for the lawsuit is that you have filed in your name? . . . A: As I said, I learned 99 percent of this information from my attorney.

It's not the kind of thing I know."), 93:9–94:13 ("Q: Do you know whether you are seeking any changes to any business practices of any of the defendants? . . . A: I would ask my attorney because he would know.  It's not my thing, and I don't know. . . . Q: What's your understanding of the business of the defendants in this case? . . . A: That's not something that I know.  That's something you have to ask my attorney."), 126:18–25 ("Q: I am asking what kind of relief are you seeking in this case? . . . A: I just understand that he's doing something very positive.  I don't know exactly what it is but my attorney knows something amazing.").)  When asked, she is unable to explain how the lawsuit relates to any events that occurred in her life.  (Id. at 147:20–148:4.)  She claims not to know what a class action is (id. at 200:13–19) or that she is the putative class representative.  (Id. at 201:4–7.)  She disputes that she opened a credit card account with Chase, a fact that was admitted in her answers to Midland's interrogatories.  (Id. at 148:12–149:9.)

Kulig does appear to understand at a very general level what this lawsuit involves: in her deposition, she states that the defendants "sued me after too many years passed; and they did that to the other 2,000 people as well; and apparently they're still doing it now."  (Id. at 90:15–18.)  She has also displayed no unwillingness to pursue this litigation.  Under the rule that "general knowledge is sufficient to show adequacy," N.J. Carpenters Health Fund v. Residential Capital, LLC, 272 F.R.D. 160, 164 (S.D.N.Y. 2011) and that a class representative is "entitled to rely on the expertise of counsel," In re Vivendi Universal, S.A., 242 F.R.D. 76, 88 (S.D.N.Y. 2007), this might be sufficient to render Kulig an adequate class representative.  But in cases where the class representative's understanding of the case is minimal, counsel's adequacy takes on even greater importance.  See In re TCW/DW N. Am. Gov't Income Trust Sec. Litig., 941 F. Supp. 326, 341 (S.D.N.Y. 1996) (dismissing an adequacy challenge based on the representative's

lack of knowledge in part because "the Court has high regard for and confidence in both the lead class counsel and other counsel representing this class"). If the representative is manifestly unable to supervise class counsel, a court must have absolute confidence in counsel's competence and loyalty to the class. See Maywalt, 67 F.3d at 1078 ("The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court.").

Whether or not Keshavarz communicated the $20,000 individual offer to Kulig, it remains conceded that he failed to convey Midland's class-wide settlement offer to her. Keshavarz argues that this was inadvertent, and further, that this caused no prejudice to the class because the offer was "singularly anemic." (Pl.'s Reply Br. 3.) Nowhere in his original submissions on the certification motion did Keshavarz explain that this failure was unintentional, however. Instead, his statement that "[t]here was no point" in conveying the offer suggests that Keshavarz consciously chose not to do so based on the current state of document discovery and his evaluation of the offer's worth. As explained in the Court's September 26 order, the receipt of a settlement offer is a particularly important milestone in a litigation, and a lawyer's obligation to inform clients of settlement offers is a bedrock duty subject to no exceptions. See Rule 1.4(a)(1)(iii), N.Y. R. Prof'l Conduct. Keshavarz's apparently deliberate disregard of this duty, then, gives the Court little confidence in his ability to represent the class fairly. But in any event, even an unintentional failure to convey a settlement offer is not the hallmark of a lawyer who takes seriously his obligation to communicate with his client. The Court's doubts on that subject are compounded by the fact that Keshavarz also admits to having made an offer of settlement to Midland without Kulig's knowledge. (Pl.'s Reply Br. 5.) Keshavarz justifies this second failure by arguing that his offer was equivalent to "nearly complete victory at trial" (id.),

but this rationalization is once again indicative of a lack of commitment to meaningful attorney-client communication.  In short, particularly given Kulig's rudimentary understanding of this lawsuit, the Court remains unconvinced that Keshavarz would "fairly and adequately represent the interests of the class" under Rule 23(g)(4).

The Court emphasizes that its decision to deny certification does not prejudice the individual claims of putative class members, since American Pipe tolling applies to them.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983) (extending American Pipe tolling to class members who file individual suits following the denial of class certification).  Moreover, although the Second Circuit has expressly left the issue open, see Korwek v. Hunt, 827 F.2d 874, 879 (2d Cir. 1987), other circuit courts and courts in this District have held that American Pipe tolling also applies to subsequent class actions filed by putative class members where, as here, certification is originally denied for reasons other than a deficiency in the purported class itself.  Yang v. Odom, 392 F.3d 97, 104 (3d Cir. 2004), cert. denied, 544 U.S. 1048 (2005); Catholic Soc. Servs., Inc. v. I.N.S., 232 F.3d 1139, 1149 (9th Cir. 2000) (holding that American Pipe tolling applied where the plaintiffs were "not attempting to relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier would-be class"); In re Nat'l Australia Bank Sec. Litig., No. 03 Civ. 6537(BSJ), 2006 WL 3844463, at *4 (S.D.N.Y. Nov. 8, 2006) (applying American Pipe tolling because "there is nothing wrong with the class claims, just something inadequate about the lead plaintiff asserting them"); cf. Great Plains Trust Co. v. Union Pacific R.R. Co., 492 F.3d 986, 997 (8th Cir. 2007) (citing Yang and Catholic Social Services, and noting that "[w]hether the American Pipe rule applies to subsequent class actions . . . depends on the reasons for the denial of certification of the predecessor action"); see generally Rhonda Wasserman, Tolling: The American Pipe Tolling Rule and Successive Class

- 9 -

Actions, 58 Fla. L. Rev. 803, 858 (2006) (arguing that tolling should apply "where certification initially was denied because of a problem with the class representative and a new plaintiff who does not suffer from that problem commences the successive class action"); but see Griffin v. Singletary, 17 F.3d 356, 358–59 (11th Cir. 1994) (declining to apply American Pipe tolling where previous lead plaintiff had been found to lack standing).

For the foregoing reasons, the motion for reconsideration or to alter is DENIED. Plaintiff's counsel is directed to transmit a copy of this Memorandum and Order to Ms. Kulig within 3 days.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       November 20, 2014